IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LEE ANN LUNT,<br><br>     Plaintiff,<br><br><br>  vs.<br><br><br>METROPOLITAN LIFE INSURANCE CO.,<br>a.k.a. METLIFE,<br><br>    Defendant. | **MEMORANDUM DECISION**<br>**AND ORDER**<br><br><br><br>Case No. 2:05-cv-784 TC |

  This matter comes before the court on dispositive cross-motions.  Plaintiff Lee Ann Lunt has moved for Summary Judgment, and Defendant Metropolitan Life Insurance Co. ("MetLife") has moved to uphold MetLife's claim determination based on the Administrative Record.

  The court reviews MetLife's determination under the arbitrary and capricious standard because the Summary Plan Description ("SPD") gives MetLife discretion to determine whether a claimant qualifies for benefits.  And there is sufficient evidence in the record to support MetLife's claim denial given this highly deferential standard.

  For the reasons explained more fully below, the court GRANTS MetLife's motion and DENIES Ms. Lunt's motion.

# BACKGROUND[1]

After serving as a nurse for eighteen years with Intermountain Health Care ("IHC"), Ms. Lunt stopped working on or about June 22, 1997.  Some time thereafter, Ms. Lunt's nursing license expired, but it is not clear on what date she was no longer licensed.

Ms. Lunt's long and extensive medical troubles began in early 1991 when she was admitted to a hospital with congestive heart failure and pulmonary edema.  Shortly after, a pharmacy error lead to Ms. Lunt's taking an anabolic steroid with high levels of testosterone for seven months.  She fell victim to cardiac arrest in her home and suffered several other symptoms.  She was subsequently hospitalized for syncope,[2] as well as for heart catheterization, and eventually underwent mitral valve replacement surgery.

All told, before resigning from IHC, Ms. Lunt had been diagnosed with severe mitral regurgitation, tricuspid and pulmonic regurgitation, pulmonary hypertension, syncopal episodes and intense fatigue.

Shortly after leaving IHC, Ms. Lunt submitted a claim for long-term disability with Associated American in October of 1997 under IHC's group benefits plan ("Plan").  On November 12, 1997, Associated American approved temporary disability benefits.

When MetLife took over for Associated American on July 14, 2003, Ms. Lunt had been

---

[1]The parties do not dispute any material facts, and this section is intended to serve as a brief summary of the extensive Administrative Record, discussing only those facts necessary for this decision.  All record citations refer to the Administrative Record, attached as Ex. A to Def.'s Mem. Supp. J. on R.

[2]Syncope is the "temporary loss of consciousness and posture, described as 'fainting' or 'passing out.'"  American Heart Association, Syncope (2007), http://www.americanheart.org/presenter.jhtml?identifier=4749.

receiving benefits for over five years.  MetLife asked her for several forms in order "to evaluate [her] continued disability on an ongoing basis."  (R. at 784.)

Ms. Lunt initially failed to respond in a timely manner, so MetLife suspended her benefits.  When it notified Ms. Lunt that her benefits would be terminated if she did not submit specific documents by November 1, 2003, MetLife asked for an attending physician statement ("APS"), medical authorizations, physician, medication and insurance information, consent for release of social security information, training, education, and experience statement, activities of daily living questionnaire, and proof of age.  (R. at 482.)

On October 30, 2003, Ms. Lunt submitted the activities of daily living form.  (R. at 719-23.)  On the form, she indicated that although she assisted her elderly parents, she needed extra hours of sleep and that her fatigue and pain prevented her from working.  She also noted that she had attempted to start a home-based business to distribute nutritional supplements.  The business was not successful.

In a letter dated November 14, 2003, MetLife terminated Ms. Lunt's benefits effective September 30, 2003.  (R. at 440-41.)  MetLife explained that it had to rely on the information in her record because she never submitted the APS.  MetLife pointed to a 1999 function capacities evaluation which indicated Ms. Lunt was capable of medium duty physical demands.  In the evaluation, Ms. Lunt had reported that she helped her elderly mother.  Discussing several reports and records from Ms. Lunt's file dated between 1997 and 1999, MetLife concluded Ms. Lunt did not meet the definition of disabled under the Plan.

On that same day—November 14, 2003—MetLife received Dr. Lucinda Bateman's APS by fax.  (R. at 463-65.)  Dr. Bateman diagnosed Ms. Lunt with chronic fatigue syndrome

3

("CFS"), mitral valve regurgitation, tricuspid regurgitation, and pulmonary valve regurgitation. Based on the totality of these ailments, Dr. Bateman's opinion was that Ms. Lunt was not capable of returning to part time or full time employment.

In a letter to Ms. Lunt dated November 18, 2003, MetLife stated that it had received Dr. Bateman's APS and had requested her file from Dr. Bateman.  (R. at 460-61.)  MetLife also advised Ms. Lunt she should submit any additional documentation no later than December 16, 2003, and that she should explain why she disagreed with the decision to terminate her benefits.

Ms. Lunt responded on December 5, 2003, explaining that she was "still unable to work due to [her] health" and that her "physician has told [her] that it would be a detriment to [her] health if [she] should try to work."  (R. at 437.)  Moreover, Ms. Lunt reported that she required at least fourteen hours of sleep each night.  Addressing MetLife's concerns, she declared:

> While it is true I do some light housework, I only do a load of wash in a day, I do not clean the house, I do not do the dishes every day, many times my sister-in-laws do them.  I do prepare a light meal for lunch, but other people cook and provide my supper for me and my parents.  My brothers take turns fixing breakfast for my parents.  They also take turns sleeping here to care for my parents at night.  Someone else has to change the beds, because I can not tolerate the lifting and bending over.  I now can shop for short periods of time.  For a trip of any length I ride with someone else doing the driving.

(Id.)

In response to the letter, MetLife referred Ms. Lunt's file to Dr. R. Kevin Smith for an independent Physician's Consultant Review ("PCR").  Dr. Smith reviewed the medical record to assess her "work abilities at any occupation."  (R. at 706-10.)  He did not personally examine Ms. Lunt, but concluded that Ms. Lunt's subjective complaints were inconsistent with the objective diagnoses and that the objective medical evidence did not support her inability to work.

4

Accordingly, Dr. Smith determined that Ms. Lunt could work on a full time basis in a sedentary capacity.

MetLife sent the PCR to Dr. Bateman, asking her to respond to Dr. Smith's conclusions no later than January 17, 2004.  MetLife also asked Ms. Lunt to submit any additional evidence in support of her claim by that date.

By letter dated January 3, 2004, Dr. Bateman disagreed with Dr. Smith's opinions, "find[ing] them inaccurate and not a clear reflection of [her] own clinical experience or the existing medical record."  (R. at 431.)  The doctor expressly disagreed with any implied assertion of somatization by Ms. Lunt, "find[ing] her to be hard working and genuinely interested in living a productive life."  (R. at 432.)  Although she acknowledged that CFS may be reasonably interpreted as somatization, Dr. Bateman pointed out that the inconsistencies between Ms. Lunt's objective and subjective symptoms could actually support a finding of CFS.  Dr. Bateman also highlighted Ms. Lunt's extensive list of medical problems, including hypothyroidism, obstructive sleep apnea, prior depression, reflux, insulin resistance syndrome, osteoarthritis, and mitral valve disease.  After listing these problems, Dr. Bateman opined that Ms. Lunt "clearly has a number of well documented medical problems, perhaps enough in combination to render her disabled without evoking the diagnosis of CFS."  (R. at 432.)  Ultimately, Dr. Bateman did "not believe [Ms. Lunt] has the physical stamina and health to return to her previous career as a nurse," and that Ms. Lunt "probably wouldn't tolerate a full time load of any employment."  (R. at 433.)

In her report, Dr. Bateman also pointed out some inaccuracies in Dr. Smith's report, such as Dr. Smith's noting an excellent history of exercise tolerance.  MetLife forwarded Dr. Bateman's report to Dr. Smith, and Dr. Smith corrected and explained the inaccuracies that Dr.

Bateman has noted.  Dr. Smith, however, still did not believe that Ms. Lunt was disabled, despite

Dr. Bateman's report.  (R. at 424-26.)  But because Dr. Bateman felt so strongly, Dr. Smith

recommended that MetLife refer the file to an independent physician.

    Based on Dr. Smith's request, MetLife referred Ms. Lunt's file to Dr. Caryl Brailsford for

an independent medical examination ("IME").  (R. at 401-07.)  On February 12, 2004, Dr.

Brailsford saw Ms. Lunt and noted Ms. Lunt's previous diagnoses of post cardiomyopathy with

syncopal episodes, chronic cough, hypothyroidism, degenerative joint disease in her left knee,

history of syncope, CFS with evidence of cardiac dysfunction, and memory deficit.  The doctor

also determined that Ms. Lunt was not likely malingering, bolstering the reliability of her self-

reported symptoms.  While finding that Ms. Lunt "probably could do sedentary work," Dr.

Brailsford also noted that "[i]t is unlikely she would be successful at full-time sedentary

work . . . ."  (R. at 406-07.)  Also, although Dr. Brailsford acknowledged that she was "not

qualified to evaluate fully" Ms. Lunt's memory deficits, Dr. Brailsford expressed concern that

memory problems "would preempt her from being able to participate as a registered nurse of

health educator in any capacity."  (R. at 406-07.)  Accordingly, the doctor recommended that

someone with pertinent expertise evaluate Ms. Lunt's cognitive function, as well as her

sleepiness.

    For a cognitive assessment, Metlife referred the case to Clinical Neuropsychologist, Dr.

James Comer, Ph.D., who conducted a neuropsychological evaluation of Ms. Lunt.  Issuing his

report on May 7, 2004, Dr. Comer found "that Ms. Lunt is a woman of average to high average

general intelligence whose higher mental functions are relatively well preserved."  (R. at 397.)

And the doctor found Ms. Lunt's "[s]cores on tests of memory for both verbal and visual

information range from average to very superior."  (Id.)  Although he cautioned that the "non-stressful environment of the testing office may not generalize fully to her everyday life, with its conditions of physical and emotional stress," Dr. Comer concluded "that Ms. Lunt possesses sufficient cognitive capacity to perform full time sedentary work of at least moderate difficulty." (R. at 397-98.)

In light of Dr. Comer's report, Dr. Brailsford changed her opinion about Ms. Lunt's ability to work, "believ[ing] she could perform sedentary work "  (R. at 376.)  Dr. Brailsford specifically noted that "Dr. Comer's report[] changes my opinion as to whether Ms. Lunt could perform full-time sedentary work.  At this point I believe she could."  (R. at 377.)  Dr. Brailsford explained that "[t]he presumed cognitive deficits that I appreciated appear to be not as severe as they potentially could have [been]."  (R. at 376.)

With Dr. Brailsford's new conclusion, MetLife called Ms. Lunt to inform her that it would not change its decision to terminate her benefits on June 22, 2004.

By fax a few days later, Dr. Brailsford revised her report, penciling in that Ms. Lunt could work twenty hours per week.  (R. at 378.)  MetLife then concluded that Ms. Lunt could initially start working twenty hours per week and gradually increase over time.  And Dr. Smith authored another report on June 30, 2004, finding that "the medical records that I reviewed did not support [Ms. Lunt's] inability to work at a sedentary work capacity."  (R. at 366.)

MetLife then received a Labor Market Survey ("LMS") dated July 8, 2004, written by Ms. Renee Lange of CorVel Corporation.  (R. at 368-73.)  Ms. Lange identified eleven positions within sixty miles of Duncan, Arizona—Ms. Lunt's residence at the time of the report—or Salt Lake City, Utah—Ms. Lunt's residence at time of disability—in which Ms. Lunt could be

employed despite her disability.  Each of the eleven positions required a nursing license.  Six of

the positions required frequent sitting, standing and, walking or traveling to appointments.  The

remaining opportunities all required frequent keyboarding work.[3]

     After receiving Ms. Lange's report, MetLife confirmed that Ms. Lunt's benefits were

terminated in a letter dated July 29, 2004.

     Ms. Lunt filed a notice of appeal on May 10, 2005.  Included with the notice, Ms. Lunt

submitted an evaluation from Dr. Brent Layton.  Dr. Layton completed a medical consultation on

March 18, 2005, and concluded "I don't' [sic] think sitting, hearing, speaking or traveling would

present a problem for the claimant."  (R. at 1299.)  Despite this conclusion, Dr. Layton offered

the rather broad conclusion that "I do not fell [sic] that the patient will be able to be gainfully

employed."  (Id.)

     Consequently, MetLife referred Ms. Lunt's file to another set of physician consultants.

Without personally examining Ms. Lunt, Dr. J.W. Rodgers authored a report on June 2, 2005.

Dr. Rodgers concluded that the file "failed to reveal any chronic pulmonary followup."  (R. at

78.)  That same date, Dr. Dennis Gordan wrote that "the only diagnosis within the pervue [sic] of

this review that may lead to impairment is degenerative joint disease of the left knee."  (R. at

1981.)

     And finally, Dr. Joel Maslow reviewed the file and submitted a report on June 15, 2005.

Without personally examining Ms. Lunt, Dr. Maslow determined that "Ms. Lunt is capable of

---

     [3]On July 15, 2004, Ms. Lunt saw another physician who noted pain in her wrists and
numbness in her hands, consistent with carpal tunnel syndrome.  That doctor cautioned that Ms.
Lunt may also have cervical radiculopathy.

working in position that did not require significant activity and was primarily sedentary." (R. at 90.) But he also determined "[a]ny duties would be limited by carpal tunnel syndrome and would preclude significant typing, etc." (Id.)

Ultimately, MetLife upheld the termination of benefits in a letter to Ms. Lunt's counsel, dated June 23, 2005. Ms. Lunt then filed this lawsuit.

## ANALYSIS

The parties agree the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., controls the Plan. Applying ERISA, the court will determine: (1) the standard of review to apply in this case; and (2) whether the claim denial satisfies this standard.

## I.   MetLife's Denial of Benefits is Subject to Arbitrary and Capricious Review

### A.   Standard of Review

Because the Plan confers MetLife discretion, the court reviews the denial of claim benefits under the arbitrary and capricious standard of review.

It is long established that "parties to a contract can agree to vest discretionary authority in an administrator." Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1002 (10th Cir. 2004). And the Supreme Court has explained that denial of benefits under ERISA is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Alternatively, "[i]f the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious." Nance v. Sun Life Assurance Co. of Can., 294 F.3d 1263, 1266 (10th Cir. 2002).

Because the Tenth Circuit has been "comparatively liberal in construing language to trigger the more deferential standard of review under ERISA," id. at 1268, plan language which requires a claimant to offer proof of disability satisfactory to the plan administrator triggers the arbitrary and capricious review.  See Ray v. UNUM Life Ins. Co. of Am., 314 F.3d 482, 486 (10th Cir. 2002) ("We held that language requiring proof 'satisfactory to [plan administrator] suffices to convey discretion to a plan administrator.'") (quoting Nance, 294 F.3d at 1268) (alteration in original).  But if the plan's language simply requires proof of disability, "without specifying who must be satisfied, [the plan] does not vest a plan administrator with discretion," and arbitrary and capricious review is not warranted.  Id. (When a plan "solely requires a claimant to submit to [a plan administrator] 'proof' of disability, it did not vest [plan administrator] with discretionary power.").

On five separate instances, the SPD unequivocally gives MetLife discretion to make the decision regarding benefits, rather than relying on objective criteria.[4]  ((R. at 6) ("[i]f you have become disabled and your disability is approved by the plan administrator . . . ."  ) (emphasis added).); ((R. at 9) ("To receive benefits under his insurance plan, your disability . . . must be approved by Associated American.") ("If you file your claim . . . and your claim is approved . . . ." ) (emphasis added).); ((R. at 10) ("If disability occurs as a result of a mental or emotional illness . . . coverage . . . will not be approved until Associated American has reviewed and approved a written treatment plan . . . .") (emphasis added).); ((R. at 13) ("If your claim is

_____

[4]Another court in this district recently ruled that identical language afforded discretion to a plan administrator.  See Streeter v. Metropolitan Life Ins., No. 2:04-CV-1190, 2006 WL 2944876, at *1 n.14 (D. Utah Oct. 13, 2006).

filed on a timely basis <u>and approved by Associated American</u>, you will begin to accrue

benefits . . . .") (emphasis added).).[5]

Because the proof of disability must be satisfactory to MetLife—as opposed to satisfying

an objective standard—the court finds the Plan afforded MetLife discretion, thereby triggering an

arbitrary and capricious standard of review.

B.    <u>Conflict of Interest</u>

The Tenth Circuit has adopted a two-step approach for dealing with conflicts of interest

in ERISA cases.

First, the court must determine whether a conflict of interest exists because "[t]he

possibility of an administrator operating under a conflict of interest . . . changes the [arbitrary and

capricious] analysis."  <u>Fought</u>, 379 F.3d at 1003; <u>see also</u> <u>Adamson v. UNUM Life Ins. Co. of</u>

<u>Am.</u>, 455 F.3d 1209, 1212 (10th Cir. 2006) ("We do note that where a 'standard' conflict of

interest exists, the plan administrator's decision is entitled to less deference, and the standard

conflict is regarded 'as one factor in determining whether the plan administrator's denial of

benefits was arbitrary and capricious.'") (quoting <u>Fought</u>, 379 F.3d at 1005).  As the Supreme

Court noted, "if a benefit plan gives discretion to an administrator or fiduciary who is operating

under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether

there is an abuse of discretion.'"  <u>Firestone</u>, 489 U.S. at 115 (quoting <u>Restatement (Second) of</u>

<u>Trusts</u> § 187 cmt. d (1959)) (alteration in original).

Second, if there is a conflict of interest, the court must decide what reduction from the

_____

[5]Although the SPD refers to Associated American, there is no dispute that MetLife
succeeded Associated American as the plan administrator.

arbitrary and capricious standard is warranted.  The reduction correlates with the extent to which the conflict jeopardized the administrator's impartiality.  Fought, 379 F.3d at 1004 ("'[T]he reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict.'") (quoting Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 (10th Cir. 1996)).

Under this second step, the claimant bears the burden of proving that the impartiality was jeopardized.  "The fact that [defendant] administered and insured the group term life insurance portion of this plan **does not on its own warrant a further reduction in deference**."[6] Adamson, 455 F.3d at 1213 (emphasis added).  Rather, "[s]ome proof (supplied by the claimant) must identify a conflict that could plausibly jeopardize the plan administrator's impartiality."  Id. The Adamson court required this additional evidence—even when the administrator doubled as

---

[6]Adamson expressly considered an inherent conflict of interest and cited to Fought for the proposition that an inherent conflict of interest does not relieve the claimant of her duty to show some evidence of jeopardized impartiality.  See Adamson, 455 F.3d at 1212-13 ("Mrs. Adamson claims that an additional reduction in deference is appropriate given an **inherent conflict of interest**. . . . We think that this approach neglects an essential prerequisite to invoking the burden shifting approach based on a conflict of interest.  Some proof (supplied by the claimant) must identify a conflict that could plausibly jeopardize the plan administrator's impartiality.") (citing Fought, 379 F.3d at 1005; Kimber v. Thiokol Corp., 196 F.3d 1092, 1097 (10th Cir. 1999)) (emphasis added).

Accordingly, Adamson clarified the rule in Fought that "[w]hen the plan administrator operates under . . . an inherent conflict of interest . . . and the plan administrator has denied coverage, . . . the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard."  Fought, 379 F.3d at 1006.

Reading Fought in light of Adamson leads to the conclusion that even in an inherent conflict of interest case, a claimant must satisfy her burden before the burden switches to the administrator to show the reasonableness of its decision.

the insurer—because "[i]t might be just as easily observed that an insurer has an incentive to pay claims and to get it right so as to avoid dissatisfaction (from plans as customers) and lawsuits." Id.  Clarifying previous opinions where "we have enunciated that 'there is an inherent conflict of interest between its discretion in paying claims and the need to stay financially sound,'[7] id. (quoting Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1296 n.4 (10th Cir. 2000)), the court explained that just because the administrator is also the insurer does not satisfy the claimant's burden since "the potential motivation of an insurer doubling as a plan administrator, [was] . . . never meant to be an ipso facto conclusive presumption to be applied without regard to the facts of the case."  Id.

If the claimant does not establish that the conflict actually jeopardized the administrator's impartiality, then the court considers the conflict as one factor in the arbitrary and capricious review.  Fought, 379 F.3d at 1005 ("[I]f the plaintiff cannot establish a serious conflict of interest, we consider defendant's standard conflict of interest as one factor in determining whether defendant's denial of disability benefits to plaintiff was arbitrary and capricious.").

But when the claimant does produce satisfactory evidence that the administrator's impartiality was jeopardized, the burden shifts to the plan administrator to show the reasonableness of its decision.  Id. at 1006 ("Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard.").  The administrator must show that

---

[7]Notably, even though the Pitman court found an inherent conflict of interest, the court "treat[ed] the conflict as one factor in determining whether an abuse of discretion occurred." Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1297 n.5 (10th Cir. 2000).

substantial evidence supports its decision, prompting the court to take a hard look at the evidence and determine whether the decision was tainted by the conflict.  Id. ("[T]he plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.  The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.").

Here, under the first step, the parties agree that MetLife has a conflict of interest because MetLife served as both the plan administrator and the plan insurer.  ((Def.'s Mem. Supp. J. on R. at 23) ("There is no dispute that MetLife has the dual capacity of the claims administrator and the insurer of the Plan.").)

But under the second step, Ms. Lunt failed to establish that this dual capacity actually jeopardized MetLife's impartiality.  In order to shift the burden to MetLife to show the reasonableness of the claim denial, Ms. Lunt needed to offer some proof that the conflict of interest tainted MetLife's impartiality.  Instead, Ms. Lunt simply emphasized that MetLife played the dual role of insurer and administrator, even though the Tenth Circuit expressly found this fact insufficient in Adamson.  455 F.3d at 1213 ("The fact that UNUM administered and insured the group term life insurance portion of this plan does not on its own warrant a further reduction in deference.").  Because she failed to provide evidence that MetLife's dual roles actually affected its decision-making, the burden never shifted to MetLife to show the reasonableness and the hard look review was never triggered.

Accordingly, the court simply considers MetLife's dual role as one factor to determine

14

whether MetLife's denial was arbitrary and capricious.

## II.   MetLife's Denial Was not Arbitrary and Capricious

When reviewing a denial of benefits under the arbitrary and capricious standard, "the decision will be upheld so long as it is predicated on a reasoned basis." Adamson, 455 F.3d at 1212.  But to satisfy arbitrary and capricious, "[t]he Administrators' decision need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within their knowledge . . . ." Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1460 (10th Cir. 1991); see also Adamson, 455 F.3d at 1212 ("A lack of substantial evidence often indicates an arbitrary and capricious decision.  Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. Substantial evidence means more than a scintilla, of course, yet less than a preponderance.") (citations omitted).  Courts "'will not substitute our judgment for the judgment of the [Administrators] unless the actions of the [Administrators] are not grounded on any reasonable basis.'" Woolsey, 934 F.2d at 1460 (quoting Oster v. Barco of Cal. Employees' Ret. Plan, 869 F.2d 1215, 1218 (9th Cir. 1988)).  Rather, "[t]he reviewing court 'need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end.'" Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (quoting Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 297 (5th Cir. 1999)) (alteration in original).

To resolve a denial of ERISA benefits "under the arbitrary and capricious standard, 'the federal courts are limited to the "administrative record"—the materials compiled by the administrator in the course of making his decision.'" Fought, 379 F.3d at 1003 (quoting Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002)); see also Panther v. Synthes,

15

380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005) ("Although defendant brings this motion

pursuant to Federal Rule of Civil Procedure 56(c), the court does not examine defendant's

motion under the traditional summary judgment standard. . . . Instead, the court acts as an

appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision

based on the evidence contained in the administrative record.").

Applying the arbitrary and capricious standard in this case, the court determines that:

(A) MetLife gave Ms. Lunt a full and fair review; and (B) Ms. Lunt did not satisfy the Plan's

definition of disabled.

A.      MetLife Afforded Ms. Lunt a Full and Fair Review

ERISA requires MetLife "provide [Ms. Lunt] adequate notice in writing . . . setting forth

the specific reasons for such denial. . . [and] afford a reasonable opportunity . . . for a full and fair

review . . . ."  29 U.S.C. § 1133.

Each time MetLife affirmed the termination of Ms. Lunt's benefits, the company fully

apprised her of the reasons in writing.  Because she was fully aware of MetLife's decision and

rationale, Ms. Lunt suffered no prejudice.  See Forrester v. Metropolitan Life Ins. Co., No.

06-3010, 2007 WL 1128873, at *1 (10th Cir. Apr. 17, 2007) ("[A]bsent [material prejudice],

substantial compliance with ERISA full and fair review requirements is sufficient.").  And Ms.

Lunt has not effectively articulated any instance where MetLife failed to satisfy its duty for a full

and fair review.

Ms. Lunt contends that MetLife failed to give sufficient weight to the fact that she

received benefits from the Social Security Administration ("SSA").  But her status with the SSA

has no bearing on this proceeding.  As the Tenth Circuit has explained "'[t]he determination of

disability under the Social Security regime cannot be equated with the determination of disability under the ERISA regime.'" Meraou v. Williams Co. Long Term Disability Plan, No. 06-5051, 2007 WL 431515, at *8 (10th Cir. Feb. 9, 2007) (quoting unpublished district court order); see also Buckardt v. Albertson's, Inc., No. 06-8005, 2007 WL 867193, at *7 (10th Cir. Mar. 23, 2007) ("Because the Plan's requirements are not identical to the requirements for SSDB, whether Buckardt met the Social Security Administration's requirements for SSDB is not relevant to our inquiry, and should not be considered."). Any alleged failure by MetLife to consider her SSA status cannot be considered arbitrary and capricious.

Ms. Lunt further argues that MetLife's decision fails arbitrary and capricious review because MetLife did not give her three particular consultant reports before denying her final administrative appeal. As support, Ms. Lunt directs the court to 29 C.F.R § 2560.503-1(m)(8) which requires a plan administrator to provide any "document, record, or other information . . . 'relevant' to a claimant's claim if" it was "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination." MetLife concluded its administrative review before providing to Ms. Lunt the reports of Dr. Maslow, Dr. Rodgers, or Dr. Gordan, although she has since received the reports.[8]

But the Tenth Circuit recently rejected a similar position in Metzger v. UNUM Life

---

[8]MetLife informed the court that it "produced to Lunt a complete copy of the administrative record on which it based its claim determination." (Def.'s Mem. Supp. J. on R. at 44.) In her Reply Memorandum, Ms. Lunt notified the court that "MetLife did not produce these reports during the administrative claim review." (Pl.'s Reply Mem. at 6.)

Because the reports were part of the Administrative Record—and because Ms. Lunt does not argue to the contrary—the court assumes the reports were provided to Ms. Lunt after her final administrative appeal.

Insurance Company of America, 476 F.3d 1161 (10th Cir. 2007).  Emphasizing that she did not

receive certain consultant reports during the administrative appeal, the claimant in Metzger

argued that she was denied full and fair review of her ERISA claim.  Id. at 1163.  The circuit did

not find the argument persuasive, holding that 29 C.F.R. § 2560.503-1 "does not require a plan

administrator to provide a claimant with access to the medical opinion reports of appeal-level

reviewers prior to a final decision on appeal."  Id. at 1167.  Rather, the court stated that an

ERISA plan administrator must disclose documents at two stages: the initial claims

determination and after the final administrative appeal.  Id. ("First, relevant documents generated

or relied upon during the initial claims determination must be disclosed prior to or at the outset of

an administrative appeal.  Second, relevant documents generated during the administrative

appeal-along with the claimant's file from the initial determination-must be disclosed after a final

decision on appeal.") (citations omitted).

     Here, the reports that MetLife did not previously produce were not used in the initial

denial, and indeed, had not been created at that time.  But the reports were disclosed after the

final administrative appeal.  MetLife satisfied its duty to produce under Metzger, and Ms. Lunt

cannot claim this denied her a full and fair review.

     And finally, despite Ms. Lunt's argument to the contrary, the mere fact that some

physicians believed Ms. Lunt incapable of sedentary work does not preclude MetLife from

relying on alternative experts.  Moreover, MetLife did not have a duty to explain why it preferred

the conclusions of particular experts.  As the Supreme Court explained "courts have no warrant

to require administrators automatically to accord special weight to the opinions of a claimant's

physician; nor may courts impose on plan administrators a discrete burden of explanation when

they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

As discussed in the Background section of this order, several experts, consultants, and physicians offered reasonable and credible opinions that Ms. Lunt was capable of employment. Dr. Gordan concluded that Ms. Lunt "is capable of sedentary level work." (R. at 1982.) Dr. Maslow similarly concluded that Ms. Lunt could return to sedentary work. (R. at 90-91.) And Dr. Brailsford "believe[d] she could" return to sedentary work. (R. at 377.) The fact some experts arrived at a different conclusion does not compel MetLife to award benefits to Ms. Lunt, and it certainly does not overcome the deferential standard burden imposed by arbitrary and capricious review. Because MetLife's decision is unquestionably supported by some reasonable basis, the court has no authority to substitute its judgment in this case. Woolsey, 934 F.2d at 1460.

After thoroughly reviewing the Administrative Record and considering Ms. Lunt's arguments, the court rules that MetLife afforded Ms. Lunt a full and fair review.

 B. Reasonable Employment Considering Education, Training and Experience

The Plan has a two-step definition of disability, but the parties contest only whether Ms. Lunt satisfied Step Two.[9] Under this step, Ms. Lunt "will be considered totally disabled only if, due to illness or injury, [she is] completely unable to engage in any gainful occupation that would be reasonable considering [her] education, training and experience." (R. at 6.)

Ms. Lunt urges that under this definition, she is disabled unless she can find employment

---

[9]Step one—not at issue in this case—requires the claimant to show she cannot perform her regular occupation. Under this step, a claimant may remain disabled for one year.

commensurate with her education, training, and experience.  Put another way, Ms. Lunt believes

Step Two required MetLife to determine whether she could find employment that would be

reasonable for someone with all of her qualifications, not whether she could find any

employment in light of all her marketable skills.[10]

Assuming without deciding that Ms. Lunt proffers the correct interpretation of the

definition of disabled, she still failed to show that MetLife's denial was arbitrary and capricious.

Before formally denying Ms. Lunt's claim, MetLife ordered the LMS to identify alternative

positions for Ms. Lunt.[11]  Because every opportunity in the LMS required a nursing license—and

---

[10]MetLife argues Ms. Lunt cannot qualify as disabled because her extensive experience, education and training could undoubtedly lead to employment in some sedentary capacity. ((Def.'s Supplemental Mem. at 5) ("Lunt's educational background and work experience obviously open many occupational possibilities for her that would not require the holding of a current nursing degree.").); ((id. at 2-3) ("Lunt is a highly educated woman whose educational and work background would open up many avenues for her to find work in a sedentary occupation other than nursing.").)  But the Plan does not simply allow MetLife to leverage Ms. Lunt's qualifications as marketing tools to expand, without limit, the list of potential employment.  Indeed, such an interpretation would bar the disability of nearly every educated claimant, as often some remedial position may exist for which a claimant is over-qualified.

MetLife's reliance on the Tenth Circuit's ruling in O'Brien v. Metropolitan Life Insurance Company, No. 92-3015, 1992 WL 151807 (10th Cir. July 1, 1992), is misplaced.  In that case, Ms. O'Brien had argued she was disabled because she lacked the requisite skills for any position, so the court upheld the denial of benefits.  Id. at *1.  The court rejected "[t]he tacit premise underlying Ms. O'Brien's arguments . . . [that] she does not have the education, training or experience that would qualify her for another job."  Id.  Instead, the court found that the "undisputed evidence clearly establishes Ms. O'Brien is fully capable of performing other jobs for which she is reasonably fitted by education, training or experience."  Id.

[11]In considering a similar definition of disabled, the Tenth Circuit required the administrator to engage in an in-depth analysis before denying an ERISA claim for benefits. Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276 (10th Cir. 2002).  The Caldwell court specifically explained that the determination of whether the claimant was able to work in a reasonable occupation "requires a complicated evaluation of a claimant's abilities, skills, and education as well as an assessment of the labor market in the claimant's geographic region."  Id. at 1289.  While the court did not require "a claims administrator [to] consider vocational or occupational evidence in reaching its determination," id. at 1290, the court nonetheless stressed

she no longer had her nursing license—Ms. Lunt argues that MetLife's relying on the LMS was arbitrary and capricious.

But even under her understanding of the Plan's definition, Ms. Lunt still had the burden of proving that she qualified for benefits.  See McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred . . . .").  And she did not show that she lost her license because of her illness or injury.[12]  Rather, Ms. Lunt has simply established that she could no longer perform her previous duties, which would satisfy only Step One.  She has not demonstrated that she is physically barred from maintaining her nursing license or that she is physically barred from working as a registered nurse in any capacity.

Consequently, it was not arbitrary and capricious for MetLife to conclude that Ms. Lunt could have pursued other opportunities which were reasonable given her qualifications.

Ms. Lunt failed to establish that it is due to her disability or illness that cannot seek the positions identified by the LMS.  Because Ms. Lunt failed to carry her burden, the court cannot

---

the importance of such evidence.  According to Caldwell, only when "a claims administrator can garner substantial evidence to demonstrate that a claimant is, in fact, able to perform other occupations (within the definition set out by the insurer) in the open labor market, . . . consideration of vocational expert evidence is unnecessary."  Id.

[12]The court requested additional briefing from the parties to address the significance of Ms. Lunt's losing her license.  Even with this additional opportunity, Ms. Lunt did not direct the court to evidence linking her many physical problems with the expiration of her nursing license. Instead, she claimed that her disability caused her to lose her license, but did not point to specific evidence which showed that she could no longer hold a license because of her ailments.  And she even noted that when she "**made the decision** to resign from her nursing position and **not to renew her nursing license**, she could not ensure she was in a condition of physical or mental health that would allow her to safely practice as a nurse."  ((Pl.'s Supplemental Mem. at 4) (emphasis added).)

conclude that MetLife's decision to deny Ms. Lunt's benefits was arbitrary and capricious, even under her interpretation of Step Two.

Given the highly deferential standard imposed by arbitrary and capricious review, the court finds sufficient support in the Administrative Record to uphold MetLife's denial of Ms. Lunt's benefits.

## CONCLUSION

For the foregoing reasons, Ms. Lunt's Motion for Summary Judgment (dkt. #30) is DENIED and MetLife's Motion on the Administrative Record to Uphold Decision Terminating Disability Benefits (dkt. #41) is GRANTED.

SO ORDERED this 29th day of June, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge